**LAW OFFICES OF CONSTANTINE BARDIS, LLC**
Constantine Bardis, Esq. (Attorney ID No. 03756-1998)
1800 Main Street, Lake Como, New Jersey 07719
Telephone: (732) 280-2500 E:bardisesquire@gmail.com
*Attorney for Plaintiff JAMES TILLINGHAST and NANCY CUDDY TILLINGHAST, husband and wife*

| | |
|---|---|
| JAMES TILLINGHAST and NANCY CUDDY TILLINGHAST, husband and wife,<br><br>*Plaintiffs,*<br><br>v.<br><br>META PLATFORMS, INC.; BOLUN YANG, individually; and JOHN DOES 1-10,<br><br>*Defendants.* | **UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY**<br><br>**Civil Action No. 3:26-cv-10472**<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND** |

Plaintiffs James Tillinghast and Nancy Cuddy Tillinghast, by and through their undersigned counsel, bring this First Amended Complaint against Defendants Meta Platforms, Inc., Bolun Yang, and John Does 1-10, and allege as follows:

## PRELIMINARY STATEMENT

**1.** This action arises from Meta Platforms, Inc.'s ("Meta") retaliation against Plaintiff James Tillinghast after he refused to sign a proposed managerial reference letter containing assertions he reasonably believed were materially inaccurate and unsupported by fact, prepared for submission to the United States Citizenship and Immigration Services ("USCIS") in connection with an employment-based immigration petition.

**2.** The proposed letter was intended to support an I-140 EB-2 National Interest Waiver ("NIW") petition for Shenxun Wang, a Meta employee. The governing NIW framework is set forth at 8 U.S.C. §1153(b)(2)(B)(i) and articulated in *Matter of Dhanasar*, 26 I&N Dec.

884, 888-91 (AAO 2016). The petition at issue was for a National Interest Waiver, not an extraordinary-ability classification.

**3.** The proposed letter was prepared or substantially prepared by Fragomen, Del Rey, Bernsen & Loewy, LLP ("Fragomen") and presented to James for his credentials, supervisory knowledge, and signature.

**4.** The draft letter attributed approximately $638 million in incremental advertising revenue to Shenxun Wang, an assertion James lacked any factual basis to attest to.

**5.** The draft letter represented or implied that Shenxun Wang created algorithms and artificial intelligence tools, an assertion James understood to be inaccurate, as Wang's role was principally product design and user experience, and engineers created and maintained the relevant algorithms and AI models.

**6.** The draft letter overstated Wang's leadership and team responsibilities in ways James could not truthfully endorse.

**7.** The draft letter also addressed the national-importance component of the NIW petition. James had no factual, professional, or governmental basis to attest that Wang's work served national security or that any agency or instrumentality of the United States government had adopted a position on Wang's work.

**8.** James consulted Meta's internal immigration counsel, revised the letter to statements he could truthfully endorse, and declined to sign the broader version. His refusal was based on an objectively reasonable, good-faith belief that he should not submit materially inaccurate statements to USCIS or lend his name and credentials to assertions he could not factually support.

**9.** James also objected to Meta's selective use of its company-coordinated immigration-support process to benefit certain Chinese-national employees while similarly situated employees of other national origins were not afforded comparable support, objecting that the allocation of this employment-related benefit was not governed by neutral, consistently applied criteria unrelated to national origin, ancestry, race, or ethnic identity.

**10.** James's objection was not directed at Chinese nationality, ancestry, or immigration status per se. It was directed at: (a) the request that he endorse materially inaccurate assertions to a federal agency; and (b) the alleged use of national origin, ancestry, race, or ethnic identity in allocating an employment-related benefit.

**11.** After James declined to endorse the broader national-importance representations, the national-importance component was addressed through a separate letter signed by Defendant Bolun Yang, James's direct manager, who had contemporaneous knowledge of James's objections and refusal.

**12.** Approximately two to three months after James's objections and refusal, Meta revoked his system access and terminated his employment. Contemporaneous termination materials did not identify underperformance. Meta later advanced an oral underperformance explanation, which James contends is pretextual.

**13.** James brings claims for retaliation under 42 U.S.C. §1981; retaliation under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §10:5-12(d); aiding and abetting NJLAD retaliation against Bolun Yang individually under N.J. Stat. Ann. §10:5-12(e); wrongful discharge in violation of New Jersey public policy (*Pierce v. Ortho Pharmaceutical Corp.*); fraudulent inducement and rescission; and, derivatively, loss of consortium by Plaintiff Nancy Cuddy Tillinghast.

## PARTIES

**14.** Plaintiff James Tillinghast is an adult individual and citizen of the State of New Jersey. James relocated to New Jersey in or about May 2024 and thereafter continuously resided and worked from New Jersey. During the operative period, including at the time of his protected activity and refusal (May-June 2024), at the time of the August 29, 2024 access revocation, and at the time of the September 30, 2024 termination, James performed his work for Meta from New Jersey. James's physical work location in New Jersey on those dates is corroborated by documented travel and contemporaneous records, including flight, lodging, calendar, and access/log records, subject to proof.

**15.** Plaintiff Nancy Cuddy Tillinghast is an adult individual and citizen of the State of New Jersey. She is the lawful spouse of James Tillinghast and brings this action for loss of consortium derivatively from James's viable underlying claims.

**16.** Defendant Meta Platforms, Inc. ("Meta") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Meta Way, Menlo Park, California 94025. Meta employed James Tillinghast and, at all relevant times, regularly conducted business in the State of New Jersey and within this District.

**17.** Defendant Bolun Yang is an individual who, at all relevant times, served as James Tillinghast's direct manager at Meta. Defendant Bolun Yang is a citizen of the State of Washington, residing in Seattle, Washington. Bolun Yang is sued in his individual capacity under N.J. Stat. Ann. §10:5-12(e). Bolun Yang's own conduct directed into New Jersey, giving rise to specific personal jurisdiction over him in this District, is described in detail in the Jurisdiction and Venue section below.

**18.** Defendants John Does 1 through 10 are, at present, unidentified individuals employed by or acting on behalf of Meta as managers, human resources personnel, or People Operations staff, who participated in the revocation of James Tillinghast's system access, the decision to terminate his employment, or related employment actions. Their identities are expected to be ascertained through discovery.

**JURISDICTION AND VENUE**

**19.** This Court has original federal-question jurisdiction under 28 U.S.C. §1331 because Count I arises under 42 U.S.C. §1981, a law of the United States.

**20.** This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. §1367(a) because those claims form part of the same case or controversy as the federal §1981 claim.

**21.** Alternatively, and independently, this Court has diversity jurisdiction under 28 U.S.C. §1332(a)(1). Plaintiffs James and Nancy Tillinghast are citizens of New Jersey. Defendant Meta is a citizen of Delaware (state of incorporation) and California (principal place of business). The amount in controversy exceeds $75,000, exclusive of interest and costs.

**22.** The amount in controversy substantially exceeds $75,000. James's 2023 W-2 reflected $565,574.76 in compensation, and following his termination he forfeited 932 unvested Meta RSUs valued at approximately $490,940.32 as of the termination date, exclusive of claimed back pay, front pay, lost benefits, reputational harm, non-economic damages, punitive damages, interest, and other relief.

**23.** This Court has specific personal jurisdiction over Defendant Meta under the Due Process Clause of the Fourteenth Amendment and the New Jersey long-arm rule, N.J. Ct. R. 4:4-4, which extends jurisdiction to the constitutional limit. Plaintiffs do not invoke general

jurisdiction. Meta is incorporated in Delaware and headquartered in California; it is not "at home" in New Jersey within the meaning of *Daimler AG v. Bauman*, 571 U.S. 117 (2014), and general jurisdiction is not relied upon.

**24.** Specific personal jurisdiction over Meta exists because Meta purposefully directed its employment conduct toward James Tillinghast in New Jersey: Meta employed James and supervised his work while he worked from New Jersey; transmitted work directives, performance communications, and the immigration-letter request into New Jersey; and executed the August 29, 2024 access revocation and September 30, 2024 termination against James while he was located and working in New Jersey. New Jersey (not merely James's residence) was the focal point of Meta's challenged employment conduct.

**25.** Plaintiffs' claims arise out of and directly relate to Meta's New Jersey-directed conduct. The relatedness requirement for specific jurisdiction is satisfied. *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007).

**26.** The exercise of specific personal jurisdiction over Meta in this District comports with traditional notions of fair play and substantial justice. Meta is a global enterprise with extensive business activities in New Jersey; litigating in this forum imposes no undue burden on Meta.

**27.** This Court has specific personal jurisdiction over Defendant Bolun Yang under the Due Process Clause and N.J. Ct. R. 4:4-4. Bolun Yang's individual liability under N.J. Stat. Ann. §10:5-12(e) arises from his own intentional tortious acts directed into New Jersey. His status as a Meta employee or agent does not shield him from personal jurisdiction in this forum. *Calder v. Jones*, 465 U.S. 783, 790 (1984).

**28.** Bolun Yang supervised James Tillinghast at all relevant times. James left the State of Washington in April 2024 and did not return to Washington during the relevant period. Beginning in or about May 2024, James resided and performed his work for Meta from New Jersey. Bolun Yang knew that James was working from New Jersey and continued to exercise direct supervisory authority over him while James was physically located in New Jersey, including by directing managerial communications, work assignments, performance feedback, and other supervisory interactions to James in New Jersey. The conduct giving rise to Plaintiffs' claims occurred during this continuing supervisory relationship while James was working from New Jersey**.**

**29.** Bolun Yang participated in, directed, or materially assisted the access revocation executed on August 29, 2024, and the termination executed effective September 30, 2024, adverse employment actions that took effect against James while James was located in and working from New Jersey. New Jersey was a focal point of Bolun Yang's tortious conduct, not merely the site where a plaintiff happened to experience the downstream effects of out-of-state decisions.

**30.** Personal jurisdiction over Bolun Yang satisfies the three-prong effects test applied in this Circuit. *IMO Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998). First, Bolun Yang's tortious conduct was intentional: he actively participated in or directed employment actions against James and supplied the substitute letter that perpetuated the conduct James had refused to facilitate. Second, Bolun Yang expressly aimed his conduct at New Jersey: he directed managerial communications and supervisory authority into James's New Jersey work location and participated in adverse employment actions against a supervisee he knew to be working from New Jersey. Third, Bolun Yang knew that the

brunt of James's injury from these actions would be felt in New Jersey, where James lived and worked.

**31.** Plaintiffs expressly disclaim any reliance on the theory that personal jurisdiction over Bolun Yang rests merely on Bolun Yang's knowledge that James resided or was located in New Jersey and that harm was felt there. An out-of-state defendant's awareness that a plaintiff will experience injury in the forum is insufficient, standing alone, to establish specific personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285, 290 (2014). Jurisdiction here rests on Bolun Yang's own affirmative conduct directed into New Jersey: the managerial communications, directives, and employment-action participation described herein, not on the fortuity of where James lived.

**32.** To the extent Defendant Bolun Yang contests personal jurisdiction, Plaintiffs reserve the right to take jurisdictional discovery to develop a full record of Bolun Yang's New Jersey-directed contacts, communications, and employment-action participation. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (jurisdictional discovery is appropriate where the plaintiff presents factual allegations suggesting that personal jurisdiction may exist).

**33.** Venue is proper in this District under 28 U.S.C. §1391(b)(2). A substantial part of the events giving rise to the claims occurred in this District, including: James's New Jersey-based work performance during the operative period; the transmission of the disputed immigration-letter request into New Jersey; James's protected activity and refusal, communicated and occurring while he was working from New Jersey; and the August 29, 2024 access revocation and September 30, 2024 termination, which took effect against James while he was located and working in New Jersey.

## FACTUAL ALLEGATIONS

**A. James's Employment at Meta**

**34.** Meta employed James Tillinghast for approximately four and a half years in the position of Manager, Product Design, Monetization GEN-AI Group.

**35.** In that role, James led and supervised product-design work on monetization and generative-AI initiatives. By virtue of that role, James had direct knowledge of Shenxun Wang's work, responsibilities, and contributions.

**36.** James reported directly to Defendant Bolun Yang and had Haihong Wang as a skip-level supervisor.

**37.** James's compensation comprised salary, bonus, benefits, and equity in the form of Restricted Stock Units ("RSUs") vesting over time, contingent in part on continued employment. In March 2024, only months before the events at issue, Meta paid James a $46,440 performance bonus and awarded him a 2024 refresh grant of 196 RSUs. Prior to the events described herein, Meta had not placed James on a Performance Improvement Plan, issued him a written performance warning, or documented a performance deficiency warranting termination.

**38.** James relocated to New Jersey in or about May 2024 and thereafter continuously resided and worked from New Jersey.

**39.** At the time of his protected activity and refusal in May and June 2024, James was performing his work for Meta from New Jersey.

**40.** At the time of the August 29, 2024 access revocation, James was located in and working from New Jersey.

**41.** At the time of the September 30, 2024 termination effective date, James was located in and working from New Jersey.

**42.** James's physical work location in New Jersey on each of those three operative dates (the period of protected activity and refusal, the access revocation, and the termination) is corroborated by documented travel and contemporaneous records, including flight, lodging, calendar, and access/log records, subject to proof.

**43.** James's protected activity and objections, including his refusal to sign the broader immigration letter and his objections communicated at the Creative Team Leads Sync meeting described below, occurred after his New Jersey relocation in May 2024, during the May-June 2024 period when James was performing his work for Meta from New Jersey. There is no gap between James's New Jersey work situs and the occurrence of his protected activity.

**B. Meta's Immigration-Support Process**

**44.** Meta maintained a centralized, company-coordinated immigration-support process involving internal immigration personnel, managers, legal counsel, and outside immigration counsel.

**45.** That process included access to immigration counsel, preparation and review of petition materials, coordination with managers, and requests for managerial reference and attestation letters for submission to USCIS.

**46.** The immigration-support process was employment-related: it assisted employees in continuing to work for Meta and served Meta's staffing, retention, and business interests.

**47.** On information and belief, Meta selectively used its immigration-support process to support certain Chinese-national employees, including by coordinating managerial letters

addressing the national-importance component of NIW petitions, while similarly situated employees of other national origins were not afforded comparable support.

**48.** James does not allege that Meta was prohibited from providing lawful immigration assistance or that Shenxun Wang was prohibited from seeking immigration benefits.

**49.** James alleges that Meta used its immigration-support process as an employment-related benefit whose allocation was not governed by neutral, consistently applied criteria unrelated to national origin, ancestry, race, or ethnic identity. These allegations are based on James's direct participation in and observation of the process described herein.

**C. The Wang NIW Petition and James's Refusal**

**50.** In or about April or May 2024, Meta and Fragomen coordinated an I-140 EB-2 NIW petition on behalf of Shenxun Wang. The petition sought a National Interest Waiver under 8 U.S.C. §1153(b)(2)(B)(i) and the framework articulated in *Matter of Dhanasar*, 26 I&N Dec. 884, 888-91 (AAO 2016).

**51.** Fragomen prepared or substantially prepared a managerial reference letter for James's signature to be submitted to USCIS in support of that petition.

**52.** The draft letter attributed approximately $638 million in incremental advertising revenue to Shenxun Wang. Wang was one of several designers working on the Advantage+ Creative product. James, as Wang's direct supervisor with firsthand knowledge of his role and contributions, lacked any factual basis to attest that Wang individually generated or was credited with that revenue figure.

**53.** The draft letter stated or implied that Shenxun Wang created algorithms and artificial intelligence tools. James understood, based on his direct supervisory knowledge, that Wang worked on the UX and product-design aspects of the product, while creation and

maintenance of algorithms and AI models fell within the responsibilities of the engineering team. James lacked any factual basis to endorse the algorithmic-creation representation.

**54.** The draft letter overstated Wang's team leadership and management responsibilities. Wang could take a lead on areas of the product from a UX perspective, but he did not supervise the expansion from five to approximately thirty professionals represented in the proposed letter and instead worked alongside the broader cross-functional team. James could not truthfully endorse the leadership characterizations as drafted.

**55.** The draft letter contained broader national-importance and U.S.-interest assertions addressed to the national-importance component of the NIW petition. James had no factual, professional, or governmental basis to endorse those assertions; he had no basis to attest that Wang's work served national security or that any United States government agency or instrumentality had adopted a position on Wang's work.

**56.** James worked with Shenxun Wang to revise the letter, removing or declining the broader national-importance portions and limiting the remaining text to statements James could truthfully endorse.

**57.** James consulted Keelcy Perez Woolley of Meta's internal immigration legal team in connection with the letter and his concerns about it. Woolley responded that if there were pieces of information James or his manager were not comfortable with, they could remove and/or generalize the material. James followed that guidance and revised the letter accordingly.

**58.** James did not refuse to support Wang's immigration petition or refuse to provide a reference. James remained willing to sign a personal managerial recommendation accurately describing his working relationship with Wang. He revised the letter to

statements he could truthfully endorse and declined to sign only the broader version containing representations he could not factually substantiate.

**59.** James's refusal was based on an objectively reasonable, good-faith belief that he should not submit materially inaccurate statements to USCIS or lend his name, credentials, or supervisory authority to assertions he could not factually support.

**60.** James also objected to Meta's selective use of its immigration-support process to benefit certain Chinese-national employees while similarly situated employees of other national origins were not afforded comparable support, objecting that the allocation of this employment-related benefit was not governed by neutral criteria unrelated to national origin, ancestry, race, or ethnic identity.

**D. Supervisory Knowledge and the Substitute Letter**

**61.** James raised his concerns at a recurring Creative Team Leads Sync meeting attended by Defendant Bolun Yang, Haihong Wang, and Tyler Manhart. This meeting occurred after James's New Jersey relocation in May 2024, during the May-June 2024 period when James was performing his work for Meta from New Jersey.

**62.** At that meeting, James explained that he had been asked to sign an NIW letter for Shenxun Wang and that he was uncomfortable endorsing the national-importance portions of the letter and the assertions he believed to be inaccurate. James also raised his objection to Meta's selective use of the immigration-support process.

**63.** Defendant Bolun Yang responded to words and effect: "Don't worry about this, we'll take care of it."

**64.** Bolun Yang and the supervisory chain, including Haihong Wang and others present at or informed of the relevant events, had actual, contemporaneous knowledge of James's objections and refusal.

**65.** After James declined to endorse the national-importance representations, Fragomen advised that the national-importance criterion could be addressed through a separate letter from a skip-level manager. The subsequent correspondence reflects that Defendant Bolun Yang, who had personally heard James's objections at the Creative Team Leads Sync meeting, was brought into that process as the substitute managerial signer. Bolun Yang supplied and signed a substitute letter addressing the national-importance component.

**66.** The national-importance component that James declined to endorse was thereafter addressed through the substitute letter signed by Bolun Yang. The complete contents and drafting history of that substitute letter, including the representations ultimately submitted to USCIS in support of the petition, are within Defendants' and/or their agents' possession and are subject to discovery.

**67.** James does not allege that Fragomen or Kelly Renaud made the decision to revoke his system access or to terminate his employment. Their participation is relevant as evidence of the process, the knowledge within Meta's supervisory chain, and the routing of the substitute letter.

**E. Access Revocation, Termination, and Separation Agreement**

**68.** On or about August 29, 2024, Meta revoked James Tillinghast's system access without notice. At the time, James was located in and working from New Jersey.

**69.** Meta terminated James's employment effective September 30, 2024. At the time, James was located in and working from New Jersey.

**70.** The termination letter did not state underperformance as a reason for termination.

**71.** Contemporaneous termination materials contained no Performance Improvement Plan, no written warning, no documented performance deficiency, and no individualized performance rationale.

**72.** The termination package bore Lee Hecht Harrison branding.

**73.** Meta later advanced an oral underperformance explanation for the termination. James contends that this explanation is pretextual: it is absent from all contemporaneous documentation; it followed, by approximately two to three months, his protected activity and refusal; and it is contradicted by Meta's own contemporaneous compensation decisions, including the $46,440 performance bonus and 196-RSU refresh grant awarded to James in March 2024, only months before the events at issue.

**74.** Meta presented James with a separation agreement. James signed the separation agreement on or about December 19, 2024.

**75.** The separation agreement contains or references a provision at §17(d) that includes or purports to include an arbitration clause and/or a delegation provision. James challenges the formation, mutual assent, scope, and enforceability of any such arbitration or delegation provision and does not concede that any enforceable arbitration agreement was presented to or assented to by him.

**F. The SpeakUp Investigation and Fraudulent Inducement**

**76.** On or about September 26, 2024, James submitted and participated in a Meta SpeakUp investigation report. That report is identified by the reference designation fwyeSu.

**77.** On or about October 3, 2024, Meta representative Cathy Isham communicated to James that severance discussions had been paused pending completion of the investigation into his report.

**78.** Tammy Clark served as Meta's investigation representative for the SpeakUp matter.

**79.** Approximately forty-eight hours before James signed the separation agreement on December 19, 2024, Tammy Clark represented to James that Meta had completed its investigation, had found no evidence, and had closed the case.

**80.** That representation was materially incomplete and misleading. On information and belief, the investigation did not adequately examine the core subjects of James’s protected activity, including the proposed letter, the substitute letter, the immigration-coordination communications, and the connection between James’s refusal and his termination. The scope and methodology of the investigation are within Meta’s exclusive knowledge and control and are subject to discovery.

**81.** Meta knew or should have known that these subjects were material to James's decision whether to sign the separation agreement.

**82.** James reasonably relied on Clark's representation in deciding to sign the separation agreement on December 19, 2024.

**83.** Had James known the true scope of the investigation, including the extent to which Meta had or had not examined the subjects material to his claims and his decision to sign, he would not have signed the separation agreement.

**84.** James's injury from Meta's fraudulent inducement includes the impairment and potential loss of the legal claims and rights that the agreement purports to release, including those asserted in this action.

**85.** James specifically challenges the formation, mutual assent, scope, and enforceability of the separation agreement, including the release and any arbitration or delegation provision at §17(d).

**G. Damages and Preservation**

**86.** James's 2023 W-2 reflected $565,574.76 in compensation. Following his termination, James forfeited 932 unvested Meta RSUs valued at approximately $490,940.32 as of the termination date. His resulting back-pay, front-pay, equity, benefit, and other economic damages will be established through proof at trial. These figures exclude mental anguish, pain and suffering, and other non-economic damages.

**87.** Plaintiff Nancy Cuddy Tillinghast seeks only derivative consortium damages arising from James's injuries described herein.

**88.** Plaintiffs have issued litigation-hold and preservation notices covering the following categories of records: Zoom records; AdobeSign records and audit trails; Workplace communications; payroll and equity records; investigation records, including records associated with Tammy Clark, Cathy Isham, and the SpeakUp report designated fwyeSu; the proposed letter and the substitute letter; and immigration-coordination communications related to the Shenxun Wang NIW petition.

## COUNT I

### Retaliation Under 42 U.S.C. §1981
### Against Defendant Meta Platforms, Inc.

**89.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**90.** 42 U.S.C. §1981 protects the making, performance, modification, and termination of employment contracts and prohibits intentional racial discrimination in all phases of an employment relationship. Section 1981 encompasses claims for retaliation. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 451-57 (2008). The statute's protections reach race, ancestry, and ethnic characteristics. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

**91.** James's opposition arose from his direct participation in and observation of Meta's company-coordinated immigration-support process as a manager. Based on those observations, James reasonably and in good faith believed that Meta was selectively providing company-sponsored managerial advocacy and immigration support to certain Chinese employees while similarly situated employees of other backgrounds were not afforded comparable support. James does not rely on citizenship or immigration status alone as the predicate for his §1981 claim; his opposition implicated ancestry, race, and ethnic identity to the extent that accurately reflects what James actually believed and communicated.

**92.** Meta had actual, contemporaneous knowledge of James's protected activity through Defendant Bolun Yang, Haihong Wang, Tyler Manhart, and others who were present at or informed of the relevant events described herein.

**93.** Meta revoked James's system access on August 29, 2024, and terminated his employment effective September 30, 2024, approximately two to three months after James's protected activity and refusal.

**94.** James's protected activity was a but-for cause of Meta's adverse employment actions. *Comcast Corp. v. National Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020).

**95.** By the conduct described herein, Meta violated 42 U.S.C. §1981.

**WHEREFORE** Plaintiff James Tillinghast demands judgment against Defendant Meta Platforms, Inc. for:

(a) economic damages, including back pay, lost compensation and benefits, subject to proof;

(b) approximately $490,940.32 in forfeited equity damages, subject to proof;

(c) front pay and/or equitable relief;

(d) reputational and compensatory damages;

(e) punitive damages;

(f) attorneys' fees and costs under 42 U.S.C. §1988(b);

(g) pre-judgment and post-judgment interest; and

(h) such other and further relief as the Court deems just and proper.

**COUNT II**

**Retaliation Under the New Jersey Law Against Discrimination,
N.J. Stat. Ann. §10:5-12(d)
Against Defendant Meta Platforms, Inc.**

**96.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**97.** The New Jersey Law Against Discrimination, N.J. Stat. Ann. §10:5-12(d), prohibits reprisals against any person who has opposed any practice forbidden by the LAD.

**98.** James engaged in protected activity by opposing conduct he reasonably and in good faith believed constituted discrimination on the basis of national origin, ancestry, race, and nationality, specifically, Meta's selective allocation of its employment-related immigration-support benefit, including managerial advocacy and retention assistance, to certain Chinese-national employees while failing to provide comparable support to similarly situated employees of other national origins.

**99.** James's opposition was not directed against Chinese nationals or against lawful immigration assistance. It was directed against the discriminatory criteria Meta used in allocating an employment-related benefit.

**100.** Meta had actual knowledge of James's protected activity, as described herein.

**101.** Meta revoked James's system access on August 29, 2024, and terminated his employment effective September 30, 2024. Meta's later-advanced oral underperformance explanation for those actions is pretextual: it is absent from all contemporaneous documentation and it followed James's protected activity.

**102.** James's protected activity was a motivating and but-for cause of Meta's adverse employment actions.

**103.** By the conduct described herein, Meta violated N.J. Stat. Ann. §10:5-12(d).

**WHEREFORE** Plaintiff James Tillinghast demands judgment against Defendant Meta Platforms, Inc. for:

(a) economic damages, including compensation-related losses and forfeited equity, subject to proof;

(b) front pay and equitable relief;

(c) reputational and compensatory damages;

(d) punitive damages to the extent authorized by law;

(e) attorneys' fees and costs under N.J. Stat. Ann. §10:5-27.1;

(f) pre-judgment and post-judgment interest; and

(g) such other and further relief as the Court deems just and proper.

**COUNT III**

**Aiding and Abetting NJLAD Retaliation,**
**N.J. Stat. Ann. §10:5-12(e)**
**Against Defendant Bolun Yang, Individually**

**104.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**105.** N.J. Stat. Ann. §10:5-12(e) prohibits any person from aiding, abetting, inciting, compelling, or coercing a violation of the NJLAD. Individual liability for aiding and abetting a LAD violation is recognized under New Jersey law. *Tarr v. Ciasulli*, 181 N.J. 70, 83-84 (2004); *Cicchetti v. Morris County Sheriff's Office*, 194 N.J. 563, 594-95 (2008).

**106.** Defendant Meta committed the underlying NJLAD retaliation as alleged in Count II.

**107.** Defendant Bolun Yang had actual, contemporaneous knowledge of James Tillinghast's objections and protected activity. Bolun Yang participated in the supervisory chain with that knowledge; responded to James's expressed concerns at the Creative Team Leads Sync; supplied and signed the substitute letter after James declined to sign the broader version; and participated in, directed, or materially influenced the employment actions (the August 29, 2024 access revocation and September 30, 2024 termination) executed against James in New Jersey.

**108.** Bolun Yang's conduct constituted knowing and substantial assistance to Meta's NJLAD violation.

**109.** Bolun Yang is individually liable under N.J. Stat. Ann. §10:5-12(e) for aiding and abetting Meta's retaliation against James Tillinghast.

**WHEREFORE** Plaintiff James Tillinghast demands judgment against Defendant Bolun Yang for:

(a) compensatory damages;

(b) punitive damages to the extent available under the NJLAD;

(c) attorneys' fees and costs;

(d) pre-judgment and post-judgment interest; and

(e) such other and further relief as the Court deems just and proper.

## COUNT IV

### Wrongful Discharge in Violation of New Jersey Public Policy
### (Pierce v. Ortho Pharmaceutical Corp.)
### Against Defendant Meta Platforms, Inc.

**110.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**111.** New Jersey recognizes a cause of action for wrongful discharge when an employer discharges an employee in violation of a clear mandate of public policy. *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 72-73 (1980). Federal public policy expressed in applicable statutes may supply the mandate. *Trzaska v. L'Oréal USA, Inc.*, 865 F.3d 155, 165-67 (3d Cir. 2017) (applying New Jersey public-policy principles where an employee refuses to participate in unsupported submissions to a governmental agency).

**112.** A clear mandate of public policy strongly favors truthful submissions to federal agencies, including USCIS, and opposes the preparation or submission of immigration documents containing statements the signatory lacks a factual basis to endorse.

**113.** That public policy is reflected, to the extent applicable, in 8 U.S.C. §1324c(a)(5) and (f), which address false statements and misrepresentations in the immigration-document context. James does not assert §1324c as an independent private cause of action. No allegation is made that any Defendant was charged with or committed immigration-document fraud.

**114.** 18 U.S.C. §1001 reflects a clear federal policy protecting the integrity of matters within the jurisdiction of federal agencies by prohibiting materially false statements, representations, and omissions. A USCIS immigration adjudication, including the adjudication of an I-140 EB-2 NIW petition, constitutes such a matter. James invokes 18 U.S.C. §1001 solely as evidence of that public policy, the federal policy against materially

false submissions to federal agencies that he refused to facilitate. No allegation is made that any Defendant committed or was charged with a criminal offense under §1001 or any other statute.

**115.** The representations James refused to endorse were material to the USCIS adjudication. Under the standard articulated in *Kungys v. United States*, 485 U.S. 759, 772 (1988), a statement is material if it has a "natural tendency to influence" the decision-maker. Each of the following representations in the proposed letter had a natural tendency to influence USCIS's adjudication of the NIW petition under the *Dhanasar* framework: (a) the attribution of approximately $638 million in incremental advertising revenue to Shenxun Wang, which bore directly on the substantial-merit prong of the adjudication; (b) the representation that Wang created algorithms and artificial intelligence tools, which bore on the description and scope of Wang's proposed endeavor and his qualifications to advance it; and (c) the overstated characterization of Wang's team leadership and management responsibilities, which bore on Wang's qualifications and the credibility of the national-importance showing. These were not peripheral descriptions. They were the evidentiary pillars of the NIW petition, and their material inaccuracy, as James reasonably and in good faith believed, presented a substantial risk of misleading a federal adjudicator.

**116.** The integrity of federal immigration adjudications, and the public interest in accurate submissions to USCIS, reinforces the clear mandate of public policy against which Meta's conduct must be measured. James's refusal to lend his name and credentials to materially inaccurate assertions for submission to a federal agency served that public interest.

**117.** James acted professionally and incrementally before refusing to sign the broader letter. He reviewed the proposed letter, identified specific factual problems based on his direct

managerial knowledge, worked with Wang to revise it, consulted Meta's internal immigration legal personnel, was advised that uncomfortable material could be removed or generalized, remained willing to provide a personal recommendation, raised the matter with management at a recurring team meeting, and declined only the representations he could not factually substantiate. James reasonably and in good faith believed that signing the broader version would require lending his name, credentials, and supervisory authority to materially inaccurate statements for submission to USCIS, conduct proscribed by the public policies reflected in 18 U.S.C. §1001 and 8 U.S.C. §1324c(a)(5).

**118.** Meta terminated James because he refused to sign the broader letter and because he raised his concerns internally. That termination violated the clear mandate of public policy identified herein.

**WHEREFORE** Plaintiff James Tillinghast demands judgment against Defendant Meta Platforms, Inc. for:

(a) economic damages, including compensation-related losses and forfeited equity, subject to proof;

(b) front pay and equitable relief;

(c) reputational and compensatory damages;

(d) punitive damages to the extent permitted by law;

(e) attorneys' fees and costs to the extent authorized; and

(f) pre-judgment and post-judgment interest; and

(g) such other and further relief as the Court deems just and proper.

## COUNT V

### Fraudulent Inducement and Rescission or Avoidance Against Defendant Meta Platforms, Inc.

**119.** Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

**120.** Meta, through its agents Tammy Clark and Cathy Isham, made material representations and omissions to James Tillinghast concerning the nature, scope, and outcome of Meta's investigation of his SpeakUp report and concerning the propriety of proceeding to a separation agreement.

**121.** On or about October 3, 2024, Cathy Isham communicated to James that severance discussions had been paused pending completion of the investigation. That communication established a reasonable expectation that the investigation would address, and had not yet addressed, the matters James had reported.

**122.** Approximately forty-eight hours before James signed the separation agreement on December 19, 2024, Tammy Clark represented to James that Meta had completed its investigation, had found no evidence, and had closed the case.

**123.** That representation was materially incomplete and misleading. On information and belief, the subjects that most bore on James's decision whether to sign, and on the value and scope of the claims he was being asked to release, had not been adequately examined. The scope and methodology of Meta's investigation, including what subjects it examined and what it did not, are within Meta's exclusive knowledge and control and are subject to discovery. Meta's representation that the investigation was complete and had found no evidence, made approximately forty-eight hours before James signed the separation agreement, was directly material to his decision.

**124.** The material incompleteness and misleading nature of Clark's representation was known or reasonably should have been known to Meta at the time it was made. The true state of the investigation (what it had and had not examined) was within Meta's exclusive knowledge and not accessible to James.

**125.** James reasonably relied on Clark's representation in deciding to sign the separation agreement on December 19, 2024. The temporal proximity between Clark's representation and the signing (approximately forty-eight hours) demonstrates the directness of that reliance.

**126.** Had James known the true scope of the investigation, including the extent to which Meta had or had not examined the subjects material to his claims and his decision to sign, he would not have signed the separation agreement.

**127.** James's injury from Meta's fraudulent inducement includes the impairment and potential loss of the legal claims and rights that the agreement purports to release, including those asserted in this action.

**128.** James seeks rescission or avoidance of the separation agreement and any release therein, or in the alternative, damages proved at trial. James specifically challenges the formation, mutual assent, scope, and enforceability of §17(d) and any arbitration or delegation provision contained in or referenced by the agreement, and does not concede that any enforceable arbitration agreement was presented to or assented to by him.

**WHEREFORE** Plaintiff James Tillinghast demands judgment against Defendant Meta Platforms, Inc. for:

(a) rescission or avoidance of the separation agreement and release;

(b) a declaration that the release is unenforceable as to the claims asserted in this action;

(c) a declaration that any arbitration or delegation provision in the agreement was not formed or is otherwise unenforceable;

(d) damages proved at trial;

(e) restitution and equitable adjustment;

(f) attorneys' fees and costs to the extent available;

(g) pre-judgment and post-judgment interest; and

(h) such other and further relief as the Court deems just and proper.

## COUNT VI

**Loss of Consortium (Derivative)**
**Claim of Plaintiff Nancy Cuddy Tillinghast**
**Against All Defendants**

**129.** Plaintiff Nancy Cuddy Tillinghast incorporates by reference all preceding paragraphs as though fully set forth herein.

**130.** Nancy Cuddy Tillinghast is the lawful spouse of James Tillinghast.

**131.** This claim is derivative of James Tillinghast's viable underlying common-law claims asserted herein.

**132.** Defendants' conduct, as alleged herein, has impaired James Tillinghast's ability to provide companionship, society, services, and support to Nancy Cuddy Tillinghast, causing her injury for which she seeks compensation.

**133.** This claim is pleaded to the extent New Jersey law recognizes consortium damages in connection with James's viable underlying claims. *Tichenor v. Santillo*, 218 N.J. Super. 165, 173 (App. Div. 1987).

**WHEREFORE** Plaintiff Nancy Cuddy Tillinghast demands judgment against Defendants for:

(a) compensatory consortium damages proved at trial;

(b) pre-judgment and post-judgment interest; and

(c) such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand trial by jury on all issues so triable.

**CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2 AND 28 U.S.C. §1746**

I certify that, to the best of my knowledge, information, and belief, the matter in controversy is not the subject of any other action pending in any court, any pending arbitration proceeding, or any administrative proceeding, except as disclosed herein. The factual allegations and legal contentions set forth in this First Amended Complaint are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law, and have not been presented for any improper purpose.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: **August 20, 2026**

Respectfully submitted,

**LAW OFFICES OF CONSTANTINE BARDIS, LLC**

By: /s/ Constantine Bardis

**Constantine Bardis, Esq.,** NJ Attorney ID No. 03756-1998
1800 Main St., Lake Como, NJ 07719
T:732.280.2500 F: 732.676.7801 E: bardisesquire@gmail.com
Attorney for Plaintiffs James Tillinghast
and Nancy Cuddy Tillinghast, husband and wife